George **SHIMABUKU** et al., Plaintiffs-
Appellants,

v.

Samuel J. **BRITTON**, Warden, United
States Penitentiary, et al., Defend-
ants-Appellees.

Ernest **NORMAN** et al., Plaintiffs-
Appellants,

v.

Samuel J. **BRITTON**, Warden, United
States Penitentiary, et al., Defend-
ants-Appellees.

Christopher T. **GLUMB**, Plaintiff-
Appellant,

v.

Samuel J. **BRITTON**, Warden, United
States Penitentiary, et al., Defend-
ants-Appellees.

Nos. 73–1323, 73–1396 and 73–1420.

United States Court of Appeals,
Tenth Circuit.

Sept. 10, 1974.

Rehearing Denied Oct. 4, 1974.

Ronald L. Roseman, Kansas City, Mo. (Stanley A. Bass, New York City, Robert Claus, Kansas City, Kan., Allen M. Ressler, Shelton, Wash., with him on the brief), for appellants.

Robert J. Roth, U. S. Atty., Topeka, Kan. (Monti L. Belot, and Bruce E. Miller, Asst. U. S. Attys., Topeka, Kan., with him on the briefs), for appellees.

Before LEWIS, Chief Judge, DUR-FEE*, Judge, Court of Claims, and BARRETT, Circuit Judge.

LEWIS, Chief Judge.

These cases originated in three separate actions, each brought by a prisoner at the United States Penitentiary at Leavenworth, Kansas.[1] Generally, the appellants challenge the constitutionality of prison regulations and procedures pursuant to which they were investigated for, and confined in segregation for, infractions of prison disciplinary rules. Significantly, in each case the facts underlying the particular disciplinary infraction have overtones indicating the potential of a subsequent federal criminal prosecution.

The district courts, treating each complaint as an application for habeas corpus relief, held that appellants were en-titled to no relief whatsoever. Shimabuku v. Britton, 357 F.Supp. 825, 827 (D. Kan.1973); order filed May 3, 1973, in consolidated cases Norman v. Britton, L–2532, and Glumb v. Britton, L–2529 (D.Kan.). While the appeals from the district courts were pending, the Supreme Court decided Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), in which it was held, *inter alia*, that certain of Nebraska's prison regulations governing the conduct of state prison disciplinary proceedings failed to satisfy the minimal requirements of constitutional due process.

In order to determine precisely the impact of *Wolff* on these appeals, we must first examine both the facts involved in appellants' complaints and the applicable Bureau of Prison regulations.

I

*A. Shimabuku et al.*

The facts were stipulated and are set out in the opinion below as presented to the district court. 357 F.Supp. at 827–832. They may be summarized as follows.

On June 14, 1972, inmate Morrow was found dead as the result of numerous knife wounds. Thereafter, each of the named appellants was removed from the general prison population and confined in one of the penitentiary's two control (or "segregation") units. On June 22, a penitentiary employee, H. E. Bailey, filed with prison officials reports in which all appellants except Coleman and Williams were charged with "investigation of possible involvement in inmate homicide." Coleman was charged with "suspicion of involvement in inmate homicide," Williams with "suspicion of involvement in inmate homicide and un-

* Court of Claims, Washington, D.C., sitting by designation.

1. *Shimabuku*, No. 73–1323, and *Norman*, No. 73–1396, were brought as class actions. *Shimabuku* was allowed to be so maintained (the class being diminished to include only appellants Coleman, Pineda, and Williams, the remaining appellants having been dismissed as not properly in forma pauperis), but *Norman* was denied class action status. Including *Glumb*, No. 73–1420, all three cases are now consolidated for the purpose of our review.

accountable absence from institutional assignment."

Bailey's reports were based, at least in part, on information received by penitentiary employees from "unofficial sources." Thus, it was reported that appellants Shimabuku, Brown, James, and Graven had actively participated in the killing of Morrow; that appellant Williams was missing from his assignment area for about two hours during the time of the killing, that he had told an unidentified informer of his plan to kill another inmate, and that he was later seen by the same informer, first entering the area where Morrow was found and then coming out alone; and that appellant Coleman had offered a bribe to an unidentified person to "get his friends off the hook." Penitentiary employees indicated further that the FBI had informed them that an inmate had admitted serving as a lookout and that appellant Pineda was near the incident area during the time of the killing.

On June 26, the penitentiary's Adjustment Committee held individual hearings for each of the appellants.[2] At each hearing the appropriate report of Bailey and Lt. J. A. Junk, who as control unit supervisor had previously questioned each appellant, was read to the appellant. The same report had also been read earlier to the particular appellant, although none had received a written report. The members of the committee then asked questions. The appellants' responses thereto and the report itself were the only evidence received by the Adjustment Committee in each of the hearings.

. The record shows that none of the appellants was advised, either at the hearing or at any earlier time, that he had any rights in respect to the conduct of the hearing or the questioning that preceded it. None of the appellants was permitted during his hearing to cross-examine or confront his accuser, to present witnesses or any other evidence, to be represented by counsel, or to have access to the committee's records and reports. None was advised that anything said before the committee would be summarized in a report that later could be used in a federal criminal prosecution. ¶¶ 11, 18, and 20, Stipulated Facts, 357 F.Supp. at 829–831.

At the time the facts were stipulated in the district court, no written report had yet been issued by the committee in which its findings or conclusions were set out. The record fails to show whether such a report was ever issued or whether any adverse report of any kind was included in the official case records of the appellants. Indeed, the record fails to show the disposition of the disciplinary proceedings altogether. In its brief, the United States asserts that none of the appellants has ever been charged, either administratively or criminally, in connection with the murder of inmate Morrow and that none of the appellants remains confined in segregation as a result thereof. It is clear that appellants Graven and Brown were released from the control unit in August 1972, but nothing is said of the others. 357 F.Supp. at 832.

Seeking both declaratory and injunctive relief, Shimabuku alleged in his complaint that, in the course of the aforementioned disciplinary proceedings, he was not accorded the protection of certain procedural safeguards to which he was entitled under the fifth amendment. Specifically, he claimed that where a prison disciplinary infraction involves facts which, if proven, also constitute a federal criminal violation, the prisoner is entitled to advance written notice of the disciplinary charges; the presence of retained counsel at the disciplinary hearing; an opportunity to confront and cross-examine adverse witnesses, call witnesses, and present evidence; access to all relevant prison records; an impartial hearing board; a written decision based on clear and convincing evidence; written reasons for any sanctions imposed; a means of re-

2. A hearing on the charge of bribery against Coleman had previously been held on June 16.

view; and freedom from segregated confinement except on a showing of a need for institutional security or safety. It was further argued that the failure to accord these safeguards was aggravated, and the right to them made more clear, by the self-incrimination which was threatened by the Bureau of Prisons' practice of providing disciplinary reports to the FBI for its use in subsequent federal criminal prosecution.

The district court considered the merits of Shimabuku's constitutional claim and concluded that the class members "have been and are accorded hearings meeting the due process requirements of the Federal Constitution, and that the plaintiffs are entitled to no relief" 357 F.Supp. at 827. Thus, it was constitutionally sufficient that, as the court found, each plaintiff had been confronted at the disciplinary hearing with the accusation against him, informed of the evidence against him, and afforded a reasonable opportunity to explain his actions. In regard to the fifth amendment self-incrimination claim, the court referred approvingly to Sands v. Wainwright, D.C., 357 F.Supp. 1062, vacated on jurisdictional grounds, 5 Cir., 491 F.2d 417, cert. denied sub nom. Guajardo v. Estelle, 416 U.S. 992, 94 S.Ct. 2403, 40 L.Ed.2d 771, in which it was held that a prisoner is entitled to use immunity in a subsequent criminal prosecution, such that his statements in the prison's prior disciplinary proceeding may not be used affirmatively against him.

### B. Norman and Glumb

On March 24, 1973, fires were set in the penitentiary's industrial area. Soon thereafter, both Norman and Glumb were confined in the penitentiary's segregation unit, apparently on suspicion of arson. As appears from Norman's complaint, both appellants were subsequently questioned by FBI agents in regard to the setting of the fires. Appellants state that they were compelled by prison officials and by the situation of their segregated confinement to submit to this questioning.

Appellants originally claimed that their continued confinement was, by itself, a violation of their due process right to be free from such confinement and its resultant loss of privileges, unless imposed pursuant to findings of a properly conducted disciplinary proceeding. It is not clear from the record whether, in fact, any disciplinary hearing was ever held. Appellants' primary claim, however, was that, during the course of the FBI investigation, they were entitled to the assistance of counsel for the purpose of preserving from prejudice their ability to defend effectively in any subsequent criminal prosecution. In their brief, appellants' arguments are now more elaborately stated, and the issues presented are identical to those in *Shimabuku.*

Based upon its review of the allegations made by Norman and Glumb, the district court dismissed the complaints, stating that "it appears beyond doubt that neither petitioner could prove facts which would entitle him to relief." Order filed May 3, 1973, in Nos. L–2532 and L–2529 (D.Kan.).

### C. Bureau of Prisons Policy Statements

With some exceptions, the applicable regulations are Bureau of Prisons Policy Statements 7400.5A and 2200.1. Neither regulation provides any explicit guidance in regard to the conduct of disciplinary investigations or proceedings. Under Policy Statement 7400.5A, the responsibility for inmate discipline is delegated by the head of the institution to the Adjustment Committee, which "shall receive reports of misconduct, conduct hearings, make findings, and impose disciplinary actions." The committee is authorized to prescribe that a prisoner be confined in segregation and may recommend the withholding or forfeiture of good-time allowances. The prisoner's case records must reflect all misconduct charges, committee dispositions, and interpretive and evaluative statements

made in respect thereto. Such records are available as necessary to the United States Board of Parole. Whenever charged misconduct also appears to violate federal criminal statutes, the head of the institution is directed to refer the facts to the appropriate federal investigative agency. Moreover, whenever such a referral is made, all Bureau of Prisons personnel are required to make available all information and evidence bearing upon the apparent offense.

Policy Statement 2200.1 provides that when an investigation of a prison infraction that also constitutes a violation of a federal statute is narrowed down to several suspects, no further questioning may occur until the suspects are informed of their rights. *See* Attachment 1 to Policy Statement 2200.1. This recitation of rights is essentially that required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

On June 6, 1972, Policy Statement 7400.5A was superseded by Statement 7400.5B, also entitled "Inmate Discipline." [3] The new regulation made significant changes to the old one. Thus, for example, 7400.5B required that each inmate be advised in writing of particular rights and correlative responsibilities in respect of his confinement at the institution. Inmates also would be advised specifically of those acts prohibited within the institution.

With respect to the conduct of prison disciplinary proceedings, 7400.5B required that inmates be afforded written notice of disciplinary charges within 24 hours of being confined in segregation. The investigation of the charges must be accomplished with comparable haste, the reporting official being ineligible to investigate his own charge. Neither the reporting nor the investigating official may sit on the Adjustment Committee. The record of each inmate in segrega-

tion shall be reviewed at least once a week. Upon making its decision on the charge, the committee must provide its conclusions, the reasons therefor, and the proposed disposition in writing. The inmate himself must also be advised in writing.

## II

In Wolff v. McDonnell, *supra*, Nebraska state prisoners brought a civil rights action under 42 U.S.C. § 1983, challenging as unconstitutional regulations governing the conduct of prison disciplinary proceedings held on charges of serious misconduct. By Nebraska law, statutory good-time credits accumulated by prisoners could be forfeited only upon a determination of serious misconduct. The Court considered whether the prisoners' interest in the conduct and the outcome of the disciplinary proceedings was sufficiently substantial so as to fall within the scope of due process protection required of fourteenth amendment liberties. So finding, the Court concluded that the regulations were constitutionally inadequate because they failed to require that inmates be provided advance written notice of charges against them and because they failed to require that written factfindings and reasons for the disciplinary action taken be provided.

Thus, we begin here by asking whether the interests now sought to be vindicated by the appellants are sufficiently substantial that the protections of due process should have been afforded to them during the events that followed the murder of Morrow and the industrial area fires.

As a starting point, it is clear that, although "prisoners' rights" must necessarily accommodate the needs and objectives of the prison regime to which they are committed, Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.

---

3. The effective date of 7400.5B precedes the dates of the incidents involved in each of the cases presently before us. It was stipulated in *Shimabuku,* however, that 7400.5A was in effect and that 7400.5B was not yet implemented at any time material to the facts of that case.

Ed. 1356, prisoners still enjoy generally the protection of the Constitution. *See, e. g.,* Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263; Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418; Johnson v. Avery, 393 U. S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718. In short, the appellants' constitutional claims may not be disregarded out of hand. Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652. Thus, if a constitutionally protected interest can be made out, and if some harm thereto can be shown that is sufficiently grievous and that cannot be justified by the exigencies of incarceration, then a proper case for relief exists. *See* Morrissey v. Brewer, 408 U.S. 471, 481–484, 92 S.Ct. 2593, 33 L.Ed.2d 484; Board of Regents v. Roth, 408 U.S. 564, 570–572, 92 S.Ct. 2701, 33 L.Ed.2d 548; Goldberg v. Kelly, 397 U.S. 254, 260–266, 90 S.Ct. 1011, 25 L.Ed.2d 287.

Following this line of inquiry, and having considered appellants' argument, that the regulations governing their disciplinary proceedings were constitutionally inadequate, we feel constrained at the outset to notice a fatal flaw therein. No disciplinary proceeding disposition has been shown, adverse or otherwise, by any appellant. Neither a report nor any kind of summary is available as a result of any of appellants' proceedings. No connection has been made between the disciplinary procedures that, allegedly, were inadequate and that consequently failed to protect the appellants' due process interests, and the harm or deprivation that appellants allegedly have suffered, or would have suffered, as a result of those procedures. Concededly, litigants generally are not burdened with showing special damages in order to vindicate a constitutionally protected interest, and we do not suggest that such a burden should have been shoul-

dered by these appellants. But here, the claim is a denial of due process, and we believe that any failure to afford such process can be illustrated only in terms of its potential impact on the protected interest—that is, in terms of how it compromises the protected liberty.

We are persuaded in this conclusion by the presence of two factors. First, we understand that a disciplinary proceeding disposition, if it were adverse, could, depending upon the reasons therefor, impact appellants in the following way: (1) by affecting their chances for parole; (2) by causing a possible forfeiture of good-time allowances; (3) by causing a loss of privileges while in segregation; and (4) by possibly prejudicing a subsequent criminal prosecution. And we cannot deny that the cumulative weight of these potential impacts makes a strong case in favor of appellants' entitlement to some degree of due process protection. Nonetheless, on this record and for the reasons proposed by appellants, none of these impacts is possible here. Each, at least in part, turns on the disposition of the disciplinary hearing. The appellants have not, however shown that any could possibly have been realized. Furthermore, given that an institutional investigation may be begun, that segregation may be imposed, and that the Adjustment Committee may act in respect of a particular prisoner for reasons other than punishment, it does not seem harsh that we should require some showing of the particular action by which appellants were purportedly "condemned to suffer grievous loss." Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (Frankfurter, J., concurring), *quoted in* Morrissey v. Brewer, 408 U.S. at 481, 92 S. Ct. 2593.[4]

---

4. In the same light, we could also justifiably proceed on the rationale of Rivera v. Toft, 10 Cir., 477 F.2d 534, wherein we assumed that disciplinary practices were reasonably designed to promote the necessary discipline within an institution. Similarly, we could assume on the facts of this case that a "disciplinary proceeding" without a disposition is

**44**

■ Second, in *Wolff*, the Court held that due process requirements in prison disciplinary proceedings need not be applied retroactively so as to require that prison records containing disciplinary dispositions, compiled in violation of due process requirements, be expunged. 418 U.S. at 573, 94 S.Ct. 2963. Thus, even were we to reach appellants' due process argument, and were they to prevail thereon, the sole available remedy would be prospective relief from the challenged regulations. Effectively, new regulations would have to be written. But, as has been shown, new regulations have in fact been written, ones which we believe satisfy *Wolff*, and it thus appears that appellants have already received everything for which they asked and which could in any event have been granted. The due process claim being effectively mooted, we hold that appellants are entitled to no relief in respect of that argument.[5]

Appellants have also argued that the failure to be advised of their rights during the investigations (particularly those conducted by FBI agents) and during the disciplinary proceedings, violated their fifth amendment privilege against compulsory self-incrimination, because they are now threatened with the possible use of their own prior state-

ments should they subsequently be prosecuted for violations of federal criminal statutes.

■ In *Shimabuku*, the appellants were not advised of their rights during the investigation of the murder of Morrow. Policy Statement 2200.1 required that they be so advised "as soon as the investigation . . . narrowed down to several suspects." Appellants in *Shimabuku* are concerned also that statements made by them during their disciplinary proceedings might be used against them at a subsequent criminal prosecution. This possibility, they contend, poses an unconstitutional dilemma to the prisoner who endeavors to defend himself in a disciplinary proceeding. We disagree.

As the district court indicated, protection of appellants' interests in any subsequent criminal prosecution can best be effected at the time of that prosecution. The appellants would then be entitled to "use immunity" in regard to prior statements given at the disciplinary proceeding. The trial court in that prosecution can consider, with the benefit of hindsight, the special informalities and the peculiar circumstances, if any, of the prior proceedings and treat specifically the questions raised in regard to the admission of evidence.[6] Thus, the compet-

in reality no disciplinary proceeding at all. This would be consistent with the United States' position, that nothing more occurred in this case than the segregation of appellants during investigation of alleged infractions of prison disciplinary rules.

5. Reference solely to the changes effected by the new regulations is both appropriate and sufficient for our purposes here. Appellants have very singularly challenged the regulations in effect at the time of the incidents involved, and have argued neither that the old regulations were discriminatorily applied (*see* stipulation that appellants were treated "in the exact same manner" as other segregated prisoners, 357 F.Supp. at 831) nor that the prison officials acted arbitrarily or capriciously. *See* 357 F.Supp. at 832; and Evans v. Moseley, 10 Cir., 455 F.2d 1084.

6. *See* Palmigiano v. Baxter, 1 Cir., 487 F.2d 1280, 1288–1290, vacated, 418 U.S. 908, 94 S.Ct. 3200, 41 L.Ed.2d 1155 (1974) ; Melson v. Sard, 131 U.S.App.D.C. 102, 402 F.2d 653, 654–655 ; *see also* Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562. In respect to the possibility that appellants were compromised by the pre-disciplinary proceeding investigation, we note that not all investigations give rise to a right, in the person being questioned, to be advised of his rights. Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. Furthermore, appellants here have stipulated, in the face of the requirement of Policy Statement 2200.1, that the prison officials at all times acted "within the rules and regulations established by the United States Penitentiary at Leavenworth, Kansas, and the United States Bureau of Prisons." 357 F.Supp. at 832.

ing considerations of the imperative nature of the self-incrimination privilege and the requirements of prison discipline may be accommodated. Accordingly, on this point we affirm the decision of the district court in *Shimabuku*.

The same argument in *Norman* and *Glumb* presents more difficult problems. The Supreme Court has recently made clear that it will not countenance the dismissal of a prisoner's complaint that alleges constitutional deprivations where the lower court concludes, on the basis of the "wide discretion" vested in prison officials as to disciplinary matters, that no claim for relief was stated. Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652; *see also* Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263; Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030. In *Haines*, the prisoner alleged, among other things, that he had suffered bodily injury while in disciplinary confinement. In both *Cruz* and *Cooper*, petitioners alleged that prison officials had denied them certain religious privileges available to other prisoners and that such discrimination violated their fundamental first amendment freedom of religion.

In *Norman* and *Glumb*, appellants have attacked the adequacy of regulations which, they claim, fail to provide the necessary protection against prejudice in any subsequent criminal prosecution. No special circumstances of arbitrary and capricious action or discriminatory application are alleged. The challenge is aimed squarely at the regulations.

In consideration both of our holding in *Shimabuku* on the same issue, and of the evident, singular implication of the allegations made by Norman and Glumb in regard to that issue, we are satisfied that the district court was correct in holding as it did, that the appellants here are entitled to no relief. Their entitlement to use immunity in a subsequent criminal prosecution is sufficient.

Affirmed.